FILED

2008 Sep-04  PM 12:19
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| **MARSHA MOORE,** | ] | |
| | ] | |
| **Plaintiff,** | ] | |
| | ] | |
| **v.** | ] | **Case No.:  2:06-CV-2009-VEH** |
| | ] | |
| **BLOUNT COUNTY BOARD OF EDUCATION,** | ] | |
| | ] | |
| **Defendant.** | ] | |

## MEMORANDUM OPINION

## I.   INTRODUCTION AND PROCEDURAL HISTORY

Plaintiff Marsha Moore ("Moore") initiated this Title VII lawsuit on October 5, 2006, alleging hostile environment (count one) and retaliation (count two) against Defendant Blount Count Board of Education ("BOE").  (*See generally* Doc. #1). Moore filed an amended complaint (Doc. #5) on October 20, 2006.

Subsequently, the BOE filed a Motion to Dismiss and/or Strike (Doc. #9) on November 1, 2006.  On December 5, 2006, the court granted this motion in part, and dismissed Moore's hostile environment claim with prejudice.  (*See* Docs. #13, #14). As a result, only Moore's retaliation count remains.

The court now has before it  BOE's Motion for Summary Judgment (Doc. #34) filed on May 15, 2008, along with its supporting materials.  (*See* Docs. #35, #36).

Moore filed her opposition (Doc. #37) and related evidence (Doc. #38) on June 5, 2008.  Finally, on June 16, 2008, BOE filed its reply (Doc. #39).  As discussed more fully below, the court finds that BOE's Motion for Summary Judgment is due to be granted.

## II.   STANDARD ON MOTION FOR SUMMARY JUDGMENT

Summary judgment is proper when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R .Civ. P. 56. All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the nonmovant.  *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993) (citation omitted).  "The substantive law applicable to the case determines which facts are material."  *Fitzpatrick*, 2 F.3d at 1115 (citation omitted).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

A plaintiff in an employment discrimination case maintains the ultimate burden of proving that the adverse employment decision was made because of intentional discrimination.  *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 134 (2000); *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 509-12 (1993); *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1184 (11th Cir. 1984).  Although the Supreme Court previously established the basic allocation of burdens and order of

2

proof in a disparate treatment case, *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248 (1981), as modified by *Desert Palace v. Costa*, 539 U.S. 90 (2003), that allocation scheme applies only in cases where there is no direct evidence of discrimination, *Grigsby v. Reynolds Metals Co.*, 821 F.2d 590, 595 (11th Cir. 1987).[1]

Under the *McDonnell Douglas/Burdine* framework, a plaintiff first has the burden of proving by a preponderance of the evidence a *prima facie* case of discrimination. Once the plaintiff proves a *prima facie* case, the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its employment decision. Finally, if the defendant carries its burden, the plaintiff must either prove by a preponderance of the evidence that the legitimate reasons offered by the defendant are merely a pretext for discrimination or present sufficient evidence, of any type, for a reasonable jury to conclude that discrimination was a "motivating factor" for the employment action, even though defendant's legitimate reason may also be true or have played some role in the decision. *McDonnell Douglas*, 411 U.S. at 802-05; *Burdine*, 450 U.S. at 252-54; *Desert Palace*, 539 U.S. at 101-02. The court is aware that the summary judgment rule applies in job

---

[1] Moore argues that she has established a direct evidence case of retaliation in addition to a circumstantial one. (*See* Doc. #37 at 16-17 (suggesting application of both theories)).

discrimination cases just as in other cases. *Chapman v. AI Transport*, 229 F.3d 1012, 1025 (11th Cir. 2000) (rejecting an earlier, contrary general rule and emphasizing that no thumb is to be placed on either side of the scale).

## III.   STATEMENT OF FACTS[2]

### A.   MOORE'S EMPLOYMENT, PROTECTED ACTIVITY AND INITIAL WORK WITH CLEVELAND

The BOE hired Moore as the custodian at the Blount County Career Technical Center ("Tech Center") on June 8, 1999.  AF No. 1.[3]  Walter Self ("Self") was the

---

[2]  Whenever the facts are in dispute, they are stated in the manner most favorable to the non-moving party. *See Fitzpatrick*, 2 F.3d at 1115.  Therefore, these are the facts for summary judgment purposes only.  They may not be the actual facts. *See Cox v. Administrator U.S. Steel & Carnegie*, 17 F.3d 1386, 1400 (11th Cir. 1994) ("'[W]hat we state as 'facts' in this opinion for purposes of reviewing the rulings on the summary judgment motion [ ] may not be the actual facts.'") (citation omitted).

[3]  The designation "AF" stands for admitted fact and indicates a fact offered by the BOE that Moore has admitted in her written submissions on summary judgment, in her deposition testimony, or by virtue of any other evidence offered in support of her case.  Whenever Moore has adequately disputed a fact offered by the BOE, the court has accepted Moore's version.  The court's numbering of admitted facts (*e.g.*, AF No. 1) corresponds to the numbering of the BOE's Statement of Undisputed Facts as set forth in Doc. #35 and responded to by Moore in Doc. #37.  Similarly, the designation "AAF" stands for additional admitted fact and corresponds to Moore's Statement of Additional Undisputed Facts contained in Doc. #37 and responded to by the BOE in Doc. #39.  A number following a decimal point corresponds to the particular sentence within the numbered statement of facts.  For example, (AAF No. 20.2.) would indicate the second sentence of paragraph 20 of Moore's  Statement of Additional Undisputed Facts is the subject of the court's citation to the record.  Any other facts referenced by the parties that require further clarification are dealt with later in the court's opinion.

Tech Center Director and Moore's supervisor until his resignation in February 2004. AF No. 2; AAF No. 41.

Philip Cleveland ("Cleveland") became Tech Center Director and Moore's supervisor in June or July of 2004.  AF No. 3.  Cleveland has held the Director position for over three (3) years.  AAF No. 12.  Cleveland was over the physical plant at the Tech Center and supervised the technical programs at each high school.  AAF No. 13.

Pursuant to the recommendation of James Carr ("Carr"), the Superintendent of Education of the Blount County School System,[4] on May 11, 2005, the BOE transferred Moore to Southeastern Elementary. AF No. 4.[5]  Moore has never reported to work at Southeastern Elementary and, because of reported medical problems, has not reported to work since April 27, 2005, after Carr placed her on administrative leave.  AF No. 5.

On January 26, 2004, Moore complained that Self was sexually harassing her. AF No. 6.  Moore followed the appropriate procedures and protocol in making her complaint known to the BOE.  AAF No. 3.

_____

[4] AAF No. 1.  Carr has held the Superintendent position since June 2003.  *Id.*

[5] While Moore offers an alternative version of this fact to exclude Carr's role in recommending that she be transferred, such proposed fact lacks any corresponding evidentiary citation; therefore the BOE's version is deemed admitted.

Moore also expressed her complaints about Self to Diane Alldredge ("Alldredge")[6] before Self resigned.  AAF No. 50.  In particular, Moore told Alldredge that Self touched her inappropriately on at least one occasion, tried to touch her on other occasions, and asked to see parts of Moore's body.  AAF No. 51.  Alldredge had at least one conversation with Carr about Moore's complaint against Self.  AAF No. 52.

Carr was notified of Moore's sexual harassment complaint by Moore's supervisor, James Bryson, on January 26, 2004.  AAF No. 2.  Carr met with Moore to review her complaint on January 28, 2004.  AAF No. 4.  Carr interviewed Self and other members of the Tech Center staff during his investigation of Moore's complaint against Self.  AAF No. 5.

Carr determined that dirty jokes and sexual innuendos had become rampant at the Tech Center.  Carr further determined that Self was aware of and participated in such conduct at the Tech Center.  AAF No. 6.  At the conclusion of his investigation, Carr determined that Self had violated the BOE sexual harassment policy.  AAF No.

---

[6] Alldredge was employed by the BOE as an instructor at the Tech Center campus from 1992 to 2006.  AAF No. 49.  Alldredge left the Tech Center due to problems with Mrs. Self and Cleveland.  AAF No. 1 of § III.  Section III of Moore's opposition is entitled "PLAINTIFF'S FACTS WHICH ARE LIKELY DISPUTED".  (*See* Doc. #37 at 13). Whenever the court uses § III after a factual designation, it is referring to additional admitted facts from that particular part of the record.

7.

After investigating Moore's complaint, Carr gave Self the option of resigning or proceeding with the termination process; Self submitted a letter of resignation to the BOE dated February 25, 2004, which resignation the BOE accepted on March 2, 2004.  AF No. 7; AAF Nos. 8-10.

Moore filed a charge of discrimination with the EEOC on March 22, 2004, alleging sexual harassment.  AF No. 8.  Moore subsequently filed a charge of discrimination with the EEOC alleging retaliation on May 6, 2005.  AF No. 9.

Cleveland did not know about Moore's harassment complaints against Self or the circumstances of Self's separation until Moore told him in the summer of 2004. AF No. 10.  Although Cleveland knew Self and his wife, Glenda Self ("Mrs. Self"),[7] professionally as colleagues, they had no social relationship.  AF No. 11; AAF No. 14.

In the summer of 2004, Cleveland worked side by side with Moore in preparation for the upcoming school year and had no complaints about her work.  AF No. 12; AAF No. 15.  Cleveland had a mandate to improve the buildings and grounds. AF No. 13.  When Moore was asked during her deposition if "it's possible that Mr.

---

[7] The court notes that sometimes Mrs. Self's first name is alternatively spelled "Glinda" and that it is unclear from the record which version is correct.

Cleveland could have just been a demanding Director of the  school, correct?[,]"
Moore responded "Correct."  (Doc. #36 at Ex. 5 (Moore Depo.) at 81).  She further
answered affirmatively that Cleveland "was demanding of [her] and other people,
independent of whether there was such a person as Mr. Self[.]"  (*Id.* at 81-82).

Moore testified that while Cleveland never expressly indicated to her that he
resented her for complaining about Self (Doc. #36 at Ex. 5 at 76), she stated that
Cleveland was "very snappy" with her when she told him that she understood that
Self was not to come to the Tech Center without permission, that Self was not banned
from campus, and that she "was not to be discussing . . . what had taken place with
Mr. Self."  (*Id.* at 77-78).

### B.    SELF'S VISIT TO THE TECH CENTER IN NOVEMBER 2004

In the Fall of 2004, in preparation for some expansion, Cleveland asked Self
to come to the campus to show him the property lines.  AF No. 16;  AAF No. 17.
Cleveland was not made aware that Self was not allowed on the Tech Center campus
without permission.  AAF No. 16.

Self visited the Tech Center one day in November 2004 at the invitation of his
successor, Cleveland.  AF No. 17; AAF No. 18.  Neither Cleveland nor Carr knew
that Self was coming to the Tech Center that day.  AF No. 18.

Upon learning of Self's presence, Moore left the campus and called Carr.  AF

No. 19.  Carr called Cleveland and advised Cleveland that Self was not supposed to be on the Tech Center campus because of Moore's sexual harassment complaint. AAF No. 19.  Carr further immediately sent Cleveland to the Tech Center, where Cleveland instructed Self that he was not to come to the campus without prior permission from Cleveland or Carr.  AF No. 20.

Self asked Cleveland if he could visit with Mrs. Self before he left campus. AAF No. 20.1.  Cleveland obliged Self and Self went (observed, but unescorted by Cleveland) to Mrs. Self's class to visit her.  AAF No. 20.2.  Moore was not on campus at that particular time.  (Doc. # 36 at Ex. 5 at 177).

Per Carr's instructions, Cleveland also sent Self a letter instructing him not to come to the campus unless Cleveland was present.  AF No. 21.  After that November 2004 visit, Cleveland never invited Self back, and Self never returned to the Tech Center campus.  AF No. 22.

Moore did not act inappropriately in response to Self's visit to the Tech Center campus.  AAF No. 21.  Cleveland did not have any problems with Moore prior to Self's visit to the Tech Center campus.  AAF No. 22.  As indicated above, Moore testified after this incident, that Cleveland was "very snappy" with her when she told him that she understood that Self was not to come to the Tech Center without permission, that Cleveland told her Self was not banned from campus, and further that

she "was not to be discussing . . . what had taken place with Mr. Self." (Doc. #36 at Ex. 5 at 77-78). Moore further indicated "that was when [Cleveland] started retaliating against her[.]" (*Id.* at 78).

### C. PROBLEMS BETWEEN MOORE AND MRS. SELF

Mrs. Self teaches Health Science/Technology and is the Clinical Coordinator at the Tech Center, the only facility in the school system that has Mrs. Self's program. AF No. 25; AAF No. 40. Mrs. Self has been married to Self for forty-two (42) years, and she has been employed by the BOE for 30 years. AAF No. 38; AAF No. 39.

While Mrs. Self was qualified to teach in other positions in other areas of the county, there were no vacancies and the BOE could not transfer her particular program to another location. AAF No. 24; (Doc. #36 at Ex. 3 at 120-21, 269-70). Mrs. Self was not a supervisor but she is a tenured employee and had been at the Tech Center longer than Moore. AF No. #26.

Self was extremely bitter about her husband's losing his job. AAF No. 7 of § III. Cleveland became aware of a number of incidents involving Mrs. Self and Moore beginning August 2004. AAF No. 23. The Selfs sued Moore for defamation and Moore countersued the Selfs. AF No. 27.

Shortly after Self's resignation and in direct violation of Carr's instructions, Mrs. Self told two maintenance men that Moore had lied about Self and had gotten

him fired.  AF No. 28; *see also* AAF No. 46 (Mrs. Self discussed this matter with other Tech Center employees.).  Mrs. Self has never been disciplined for discussing this matter with students or faculty.  AAF No. 47.

At some point, Mrs. Self attempted to get Moore's ex-husband's girlfriend, Adina Hobbs ("Hobbs"), to come to the Tech Center, although Hobbs never actually visited.  AF No. 29.  Moore told Cleveland about Mrs. Self's overtures to Hobbs and, on or about August 20, 2004, Cleveland told both Moore and Mrs. Self that he would not tolerate inappropriate exchanges or unprofessional actions between them.  AF No. 31.  Cleveland did not attempt to investigate the invitation to Hobbs because it occurred off campus, was not work-related, and, given that the Tech Center is an open campus and welcomes members of the public, would be very difficult to enforce.  AF No. 32; *see also* AAF No. 29 (Cleveland did not address all of Moore's complaints with Mrs. Self.).

Cleveland received several complaints (perhaps as many as ten) from Moore and Mrs. Self about the other's behavior and, although he investigated them, in most cases there were no other witnesses and he could not determine who was at fault.  AF No. 33.  One or both of them requested that they not have to meet in the same room with the other, including faculty meetings.  AF No. 34.  Further, both requested that they have minimal contact with the other, so Cleveland (with review by Moore's

AEA representative) set up a work schedule for Moore so she could accomplish her duties but would work in Mrs. Self's area at times when Mrs. Self would likely not be there.  AF No. 35.

On April 26, 2005, Mrs. Self stood by her car in the school parking lot and allegedly told Moore something like "I just soon see you dead" or "let's see who looks bad now, I hope I see you dead."  AF No. 36.  Moore went to Alldredge's classroom, called Cleveland to report the comment and asked him to call the police.  AF No. 37.  Moore called the police before Cleveland arrived because she took Mrs. Self's comment as a threat.  AF No. 38.

According to Moore, when Cleveland discovered that Moore had already called the police, he was "furious," and said "I know what you're up to."  AF No. 39.  Upon learning that she had called the police, Cleveland had another teacher drive Moore to meet with Carr and file a complaint about the incident.  AF No. 40.

Cleveland investigated the threat with the police (the SRO officer), but had only Moore's word against Mrs. Self's (who denied any threat), so he did not have sufficient information to take action against Mrs. Self.  AF No. 41.  Moore met with the police but did not file a formal charge because she "knew [Mrs. Self] . . . was upset about what she thought [Moore] had lied about her husband."  AF No. 42.

Carr met with Moore and her AEA representative and put Moore on

administrative leave with pay and Moore never returned to work.  AF No. 43.  During the April 26 meeting, Carr and Moore's AEA representative suggested that Moore consider transferring away from the Tech Center.  AF No. 44.  Cleveland wanted the BOE to fire Moore in lieu of transfer.  AAF No. 9 of § III.

Mrs. Self also had difficulties with two other Tech Center employees:  Sara Hallman and Alldredge.  AAF No. 30.  While Cleveland never recommended that Mrs. Self be transferred, there also is not any evidence that shows an available vacancy to which he could recommend such a transfer.  AAF No. 31; (Doc. #36 at Ex. 3 at 269-270).  Although Cleveland counseled Mrs. Self the same way that he counseled Moore in August 2004, Mrs. Self has never been written up or reprimanded concerning the incidents between her and Moore.  AF No. 31; AAF No. 8 of § III.

Alldredge witnessed Mrs. Self giving Moore "hell."  AAF No. 2 of § III. It also appeared to Alldredge that anyone who complained to the BOE caught "mischief" from the powers that be.  AAF No. 3 of § III.  Alldredge believes anyone working for the BOE would be reluctant to make any complaints after seeing what happened to Moore.  AAF No. 4 of § III.

### D.   ISSUES RELATING TO MOORE'S JOB DESCRIPTION AND PARTICULAR ASSIGNMENTS

As of February 17, 2005, Cleveland did not have any problems with the manner

in which Moore performed her duties; however he did indicate to her a need to improve her professionalism and directed her not to do things that would interfere with the performance of her job duties.  AAF No. 32; (Doc. #36 at Ex. 3 at 145-48). In approximately February 2005, Cleveland gave Moore a job description that had been reviewed by Moore's AEA representative and reflected her essential job functions both before and after Cleveland became her supervisor. AF No. 45.  Moore thought the job description was appropriate and never contested it.  AF No. 47.

Mike Vise ("Vise"), the current Tech Center custodian who was hired to replace Moore, was given the same job description as Moore.  AF No. 46; AAF No. 25.  Vise was not given the same hourly schedule or placed under the same restrictions as Moore. AAF No. 26.  Cleveland gave Moore an hour by hour schedule and restricted access to the school building in an attempt to resolve the conflict between Moore and Mrs. Self.  AAF No. 27.  Cleveland did not place similar restrictions or parameters on Mrs. Self or any other Tech Center employees.   AAF No. 28.

Moore claims Cleveland required her to work outside of her job description in retaliation for her complaints about Mrs. Self in that he had her paint outside once when the temperature was 43 degrees and "required her to work with floor stripper and muriatic acid." AF No. 48; *see also* AAF No. 53 (Cleveland required Moore  to

14

clean using strong chemicals, (2) weed eat in the early spring when it was 30 degrees outside, and (3) pressure wash the building when it was 40 degrees outside.).

Alldredge walked in the office the day Moore was cleaning the floors with muriatic acid and remembers the smell was "awful." AAF No. 54. Alldredge did not stay in the office very long because "you could not stand it in there." AAF No. 55. Moore was complaining that the chemicals "took her breath" and made her feel bad. AAF No. 56. Alldredge told Moore "I can't believe you were out there that early in the morning having to weed eat. It's freezing cold out there." AAF No. 57. Moore told Alldredge that Cleveland told her to get out there and do it. AAF No. 58. It appeared to Alldredge that Moore was being punished because of her complaint against Self. AAF No. 59.

Moore never complained to Cleveland about painting in the cold. AF No. 49. Cleveland never asked Moore to knowingly paint outside in the cold because the paint would not stick. AF No. 50.

Moore was responsible for stripping the floors to remove wax or dirty spots or stains. AF No. 51. Cleveland found spots on the floor with thick wax build up that created slippery spots and asked Moore, who was responsible for cleaning the floors, what they could use to fix them. AF No. 52. Moore suggested the option of pure floor stripper, which was a chemical compound she had used since her hire in 1999,

including for spot cleaning before Cleveland's arrival.  AF No. 53.  Moore never told Cleveland that using the stripper was causing her illness.  AF No. 54.

In February 2005, Cleveland asked Moore to clean the grout on the floor of the office bathrooms.  AF No. 55.  Cleveland himself first attempted to clean the bathroom floors with diluted muriatic acid (a cleaning agent for mortar mix), but it was not effective.  AF No. 56.  Cleveland then poured the muriatic acid on the floor full strength and left it on overnight.  AF No. 57.

The next morning, Cleveland gave Moore a steel brush, rubber gloves, a pair of scissors, and goggles and asked her to scrub the tiles for approximately six hours. AF No. 58.  The undiluted muriatic acid did not work, so Cleveland got a rubberized compound to cover the floor.  AF No. 59.  Moore never worked with the muriatic acid again.  AF No. 60.

Moore told Cleveland she thought they should wait to attempt the cleaning with the muriatic acid until the summer, when they could better ventilate the area.  AF No. 61.  Although Moore never told Cleveland that she thought working with the muriatic acid might cause her sickness, she did complain to her AEA representative about it.  AF No. 62.

In addition to her job description, Cleveland gave Moore a schedule he wanted her to follow, which dictated that she would clean the office and student areas when

16

students were not present and concentrate on outside work during instructional time. AF No. 63.  Cleveland had observed Moore going into classrooms during the regular school day and he believed that interrupted instructional time.  AF No. 64.

Cleveland gave Moore a time schedule to attempt to keep her and Mrs. Self away from one another during the school day.  AF No. 65.  Moore accepted the schedule as appropriate and did not raise an objection to it.  AF No. 66.

Moore now claims the schedule placed a hardship on her because she had no place to "hang out," in part because Cleveland had converted the former custodian's office to a classroom.  AF No. 67; *see also* AAF No. 11 of § 3 (Moore's office was taken away to be used for a classroom.).  Cleveland used the new classroom (former custodian's office) for the Career Focus Program which served 45 students.  AF No. 68.

After receiving the time schedule, Moore was free to come into the school as necessary; her schedule simply put time limitations on when she could be in certain areas so she would not disrupt classes and she continued to have lunch with coworkers both inside and outside the building.  AF No. 69.  Cleveland never instructed a teacher to monitor Moore.  AF No. 70.

Moore never heard or saw any written instruction from Cleveland that teachers or students were not to talk to her.  AF No. 71.  Cleveland told Moore not to talk to

teachers or students during class time.  AF No. 72.  Cleveland instructed Moore not to leave campus without discussing it with him or the Assistant Director, which was a restriction Moore felt was consistent with her job responsibility.  AF No. 73.

### E.    DISCIPLINARY ACTIONS

Cleveland gave Moore several memos in an effort to communicate his expectations to her, which Moore characterizes as unwarranted written reprimands. AF No. 74. The BOE maintains that a difference exists between disciplinary actions and written personnel issues.  (Doc. #36 at Ex. 3 (Cleveland Depo.) at 136, 244-45). While none of the referenced exhibits expressly states that it is a disciplinary action, all of them include some type of performance criticism of Moore.  (Doc. #36 at Ex. 5 at Exs. 5-7, 9).

Cleveland issued a letter of concern to Moore on or about February 25, 2005, based on what Cleveland believed to be two occasions of insubordinate behavior.  AF No. 75.  Moore filed a grievance regarding the February 25, 2005, letter of concern and Cleveland retracted one portion of the letter. AF No. 76.  Cleveland and Moore's AEA representative exchanged correspondence to attempt to resolve Moore's grievance, and Moore ultimately had a hearing before the BOE.   AF No. 77.

Cleveland gave Moore a second letter of concern in April 2005, after an episode in which Moore refused to acknowledge him and refused an assignment.  AF

No. 78.  On April 21, 2005, Cleveland said good morning to Moore and, after initially ignoring him twice, she replied she did not like what he was doing and she did not want to have any discussions with him that were not directly job-related.  AF No. 79.

Cleveland then made several assignments to her, including stripping and waxing the floor in a newly renovated area.  AF No. 80.  Moore refused to perform the floor stripping job.  AF No. 81.  Cleveland then told Moore that they would meet with someone from the Central office and he set up a meeting with Carr.  AF No. 82.

Moore met that afternoon with Carr and Cleveland, and Cleveland said that Moore ignored his greetings, called him a liar, said they did not like one another and she did not want to have any discussions with him that were not work-related.  AF No. 83.  Moore told Carr that she felt Cleveland had no good intentions for her because he had not told Carr about Mrs. Self's going to her ex-husband's house nine (9) months before, denied she said she did not like Cleveland, and called Cleveland a "blatant liar."  AF No. 84.

Carr told her she was not to talk to her supervisor that way and asked Moore if she was refusing to strip and wax the floors.  AF No. 85.  Moore then agreed to strip and wax the floors.  AF No. 86.  Cleveland issued Moore a letter of concern based in part on this episode of what he perceived as insubordinate behavior.  AF No. 87.

### F.   MOORE'S TRANSFER IN MAY 2005

Moore's AEA representative suggested that Moore transfer to another school because she was so unhappy at the Tech Center.  AF No. 88.  In April 2005, Cleveland recommended that Moore be transferred to another location to resolve the recurring conflicts between Moore and Mrs. Self.  AF No. 89; AAF No. 33.  One of the reasons for the decision to transfer Moore was  to try to "improve the atmosphere at the [Tech Center]" given all the problems between Moore and Mrs. Self.  AAF No. 10 § III.  Carr  "believed [that a transfer] was an opportunity to make things better for [Moore]."  (Doc. #36 at Ex. 1 (Carr Depo.) at 61). Cleveland believed the transfer would have been in Moore's best interest because it would have separated her from Mrs. Self and "helped the whole situation."  AAF No. 35; AAF No. 5 of § III.

Although Mrs. Self had requested a transfer from the Tech Center, the BOE could not transfer Mrs. Self because she taught vocational courses for the Tech Center that had to be taught at the Tech Center, and there were no vacant positions available for which Mrs. Self had the required certification to teach.  AF No. 90.  Moore had stated that the stress of her job was affecting her health.  AF No. 91.1.  Moore's AEA representative suggested she seek a transfer.  AF No. 91.2.

Southeastern Elementary had a custodial position available that Moore could fill with no loss of salary or tenure status, that was approximately the same distance

from her house, and at which she would be one of two custodians (she was the only custodian at the Tech Center), which would lessen the pressure on her.  AF No. 92. Carr and Moore's AEA representative asked Moore to consider transferring to Southeastern Elementary and she refused even though the transfer would have taken her out of an environment about which she had complained.  AF No. 93.  Cleveland was aware that Moore did not want to be transferred.  AAF No. 36.

Because the situation at the Tech Center between Moore and Mrs. Self was not improving and Moore continued to complain about the stress of the environment, Carr exercised his authority under the Alabama Fair Dismissal Act and recommended to the BOE that Moore be transferred to Southeastern Elementary.  AF No. 94. Moore contested the transfer and had a hearing before the BOE, which approved the transfer.  AF No. 95.

Moore exercised her right to appeal the BOE's transfer decision to arbitration. AF No. 96.  Following a hearing at which Moore was represented by counsel, the federal arbitrator ruled that the BOE's  action to transfer Moore was not for political or personal reasons and was not arbitrary or unjust.  AF No. 97.  Although Moore has never reported to work at Southeastern Elementary, the position is available to her whenever she is released to return to work.  AF No. 98; AAF No. 11.

### G.   DR. MAURA P. CARTER'S TREATMENT AND EVALUATION OF MOORE

Dr. Maura P. Carter ("Dr. Carter") is employed with Grayson and Associates as a licensed psychologist specializing in clinical neuropsychology. AAF No. 60. Dr. Carter met Marsha Moore on February 8, 2005. AAF No. 61. Moore was referred to Dr. Carter by Moore's neurologist, Dr. Samuel Chastain. AAF No. 62.

Dr. Carter administered a Minnesota Multiphasic Personality Inventory-2 ("MMPI–2") on Moore in February 2005. AAF No. 63. Dr. Carter used the MMPI–2 to assess Moore's personality and emotional state. AAF No. 64.

Dr. Carter diagnosed Moore with somatization disorder, major depression recurrent moderate severity, and generalized anxiety disorder with panic attacks. AAF No. 65. Dr. Carter determined: (a) Moore's emotional symptoms are causing her to focus a great deal of attention on her physical symptoms and her resulting emotional distress is probably making many of the physical symptoms worse; (b) Moore was experiencing moderate recurrent depression; and (c) Moore was feeling a significant amount of anxiety on a consistent basis accompanied by panic attacks. AAF No. 66.

Moore's anxiety caused her heart to beat faster and prevented her from sleeping well at night. AAF No. 67.1. She was also experiencing headaches in the back part

of her head.  AAF No. 67.2.

Dr. Carter performed a neurological evaluation on Moore on December 14, 2005.  AAF No. 68.  Moore expressed to Dr. Carter that she was having difficulty with concentration and memory sufficient to interfere with her ability to function on a day in day out basis.  AAF No. 69.

Moore disclosed that she had made allegations of sexual harassment against her supervisor; the supervisor had subjected at least two other co-workers to sexual harassment; the supervisor lost his job as a result of the investigation of Moore's complaint; and she felt like she was being treated harshly and differently as a result. AAF No. 70.  Stressors can exacerbate symptoms of major depressive disorder.  AAF No. 71.

In Dr. Carter's opinion, the fact that: (a) Moore was required to work in the same vicinity as the wife of the supervisor accused of sexual harassment; (b) Moore was instructed she could not discuss her allegations with anyone while her coworker was allowed to go around the workplace telling other employees Moore was a liar and got her husband fired; (c) a coworker invited Moore's ex-husband's girlfriend to the workplace and directed her to wear something really cute to taunt Moore; (d) Moore had her office taken away from her after making allegations of sexual harassment; (e) the daughter of the terminated supervisor and coworker emailed other employees

23

calling Moore a liar and many other unflattering things; restrictions were placed on Moore's access to areas of the school; and (f) BOE members discussed Moore's allegations with the supervisor, his wife, and daughter and not Moore would aggravate Moore's condition.  AAF No. 72.  The constellation of event stressors in Moore's life were sufficient to explain the extent of her depression.  AAF No. 73.

Dr. Carter met with Moore on January 5, 2006, to review the test results and discuss her recommendations.  AAF No. 74.  In Dr. Carter's opinion, Moore's depression was so severe that it interfered with her ability to carry out her job responsibilities, particularly because the situation stressors at work had not changed significantly.  AAF No. 75.

## IV.   ANALYSIS

### A.    Moore cannot establish a direct evidence case of retaliation.

"Direct evidence of discrimination is evidence that, if believed, proves [the] existence of [a] fact in issue without inference or presumption."  *Schoenfeld v. Babbitt*, 168 F.3d 1257, 1266 (11th Cir. 1999) (alterations in original) (internal quotation marks omitted).  However, if the statement is merely suggestive of a discriminatory motive, then it is circumstantial evidence. *Id*; *see also Cooper v. Southern Co.*, 390 F.3d 695, 724 n.15 (11th Cir. 2004) ("Direct evidence is evidence which itself proves the existence of discrimination [or retaliation] and does not

require inference or interpretation, as for example a frank admission from a manager that he refused to hire an applicant because he was black or because she was female [or because she filed a charge of discrimination against a previous employer].”); *Cooper*, 390 F.3d at 724 n.15 (noting infrequency of direct evidence cases).

Moore urges that the undisputed facts that “Cleveland’s recommendation and the B[O]E’s decision to transfer Moore were motivated by ‘this situation’” (Doc. #37 at 16), establish direct evidence of retaliation against Moore for engaging in statutorily protected activity.  The court disagrees.  The words “this situation” are capable of more than one meaning under the facts of this case.  By the time of the May 2005, recommendation and decision, many events other than Moore’s January and March 2004, protected activities[8] had transpired.  Those events - between Moore and Mrs. Self and between Moore and Cleveland - are summarized above.  In light of all those events, the words “this situation” are ambiguous - that is, capable of more than one meaning, such that the hearer must infer or interpret them.  Further, “is there anything else related to program needs that you felt like would be accomplished by transferring [Moore]?” (Doc. #36 at Ex. 3 at 155 - 56), Cleveland responded, using remarkable similar terms, as follows.

A.     I just felt like it would – as I said earlier, I felt like it would be in

---

[8] *See infra*, at 34-35.

> the best interest of her.  It would help her with the complaints that
> she had made to me about her job assignments.  <u>It would, you</u>
> <u>know, help the whole situation</u>.  And, you know, I thought it was
> a good approach to take.  The location of the school was
> approximately the same distance, the same money, the same
> contract.  There was really no harm to the employee.  <u>It was a –</u>
> <u>you know, just a vertical [sic] move, and it would, you know,</u>
> <u>have helped that employee to overcome that situation</u>.

(*Id.* at 156 (emphasis added)).  Thus, <u>at best</u>, Cleveland's use of the words "this

situation" is merely suggestive of a possible retaliatory animus.  Even Moore agrees

that "the situation" refers <u>not</u> to Moore's protected activity, but rather to "the conflict

[between Moore and Mrs. Self and/or Moore and Cleveland] resulting from the filing,

investigation, and disposition of Moore's sexual harassment complaint."  (Doc. #37

at 26).  Therefore, the court must address the validity of Moore's claim under the

*McDonnell/Burdine* framework.

> **B.     Moore also cannot establish a circumstantial evidence case of
> retaliation.**
>
> **1.     Moore cannot establish a *prima facie* case of retaliation.**
>
> **a.     Moore cannot show reasonable material adversity
> regarding most, if not all, actions taken by the BOE.**

In *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006), the

Supreme Court held regarding retaliation under Title VII:

> We conclude that the anti-retaliation provision does not confine
> the actions and harms it forbids to those that are related to employment

> or occur at the workplace.  We also conclude that the provision covers those (and only those) employer actions that would have been materially adverse to a reasonable employee or job applicant.  In the present context that means that the employer's actions must be harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination.

*Id.*, 548 U.S at 57.  Prior case law in the Eleventh Circuit limited the foundation of retaliation claims to treatment amounting to adverse employment actions. Accordingly, the *prima facie* elements for retaliation under Title VII pre-*Burlington Northern* were proof of: "(1) statutorily protected expression; (2) . . . an adverse employment action; and (3) . . . a causal connection between the two events." *Brochu v. City of Riviera Beach*, 304 F.3d 1144, 1155 (11th Cir. 2002).

The Eleventh Circuit has explained the impact of *Burlington Northern* on the second *prima facie* element to a Title VII retaliation claim as:

> [T]he Supreme Court has defined an adverse employment action in the context of a retaliation claim as an action by an employer that is harmful to the point that it could well dissuade a reasonable worker from making or supporting a charge of discrimination.

*Wallace v. Georgia Dept. of Transp.*, 212 Fed. Appx. 799, 802 (11th Cir. 2006) (citation omitted).  Accordingly as reformulated post-*Burlington Northern*, "'[t]o establish a claim of retaliation under Title VII or section 1981, a plaintiff must prove that he engaged in statutorily protected activity, he suffered a materially adverse action, and there was some causal relation between the two events.'"  *Butler v.*

27

*Alabama Dept. of Transp.*, ___ F.3d ___, No. 07-13358, 2008 WL 2901768, at *3

(11th Cir. July 30, 2008) (citations omitted).

　　Additionally, as the BOE points out, *Burlington Northern* reaffirms the more

general principle that, for an action to be retaliatory, it must be taken or decided by

an employer. *Id.* at 63-64.  As the Supreme Court explained:

> An employer can effectively retaliate against an employee by taking
> actions not directly related to his employment or by causing him harm
> outside the workplace. *See, e.g., Rochon v. Gonzales*, 438 F.3d, at 1213
> (FBI retaliation against employee "took the form of the FBI's refusal,
> contrary to policy, to investigate death threats a federal prisoner made
> against [the agent] and his wife"); *Berry v. Stevinson Chevrolet*, 74 F.3d
> 980, 984, 986 (C.A. 10 1996) (finding actionable retaliation where
> employer filed false criminal charges against former employee who
> complained about discrimination). A provision limited to
> employment-related actions would not deter the many forms that
> effective retaliation can take.  Hence, such a limited construction would
> fail to fully achieve the anti-retaliation provision's "primary purpose,"
> namely, "[m]aintaining unfettered access to statutory remedial
> mechanisms." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 346, 117 S. Ct.
> 843, 136 L. Ed. 2d 808 (1997).

*Burlington Northern*, 548 U.S. at 63-64 (emphasis added).  The examples cited above

involve an employer's clear decision-making authority; conversely not all negative

actions that a plaintiff endures, such as by a co-employee, a non-supervisory

employee, or a former employee, are appropriately attributable to an employer as

retaliatory conduct just because they occurred.

28

**The Involuntary Transfer**

The primary adverse employment action about which Moore complains is her involuntary transfer occurring on May 11, 2005.  While the court can envision how an involuntary transfer might satisfy the new *Burlington Northern* reasonable material adversity test, the court concludes as a matter of law that, under the undisputed circumstances of <u>this</u> transfer, the standard has not been met.

As BOE summarizes, the transfer of Moore to a new position, included "no change in [her] salary, benefits, tenure status, or commute time[.]"  (Doc. #39 at 7).  Further, although Moore did object to the transfer, at the same time, she voiced her desire to work separately from Mrs. Self.   Additionally, it is undisputed that relocating Mrs. Self was not feasible.  Further, Moore's AEA representative agreed that Moore should consider the transfer.  In this context, the transfer of Moore by BOE to a new location to work in a position away from Mrs. Self and without any cognizable drawbacks, was not an action "harmful to the point that it could well dissuade a 'reasonable worker from making or supporting a charge of discrimination.'"

**Actions by Mrs. Self and Self**

Moore also maintains that certain actions by Mrs. Self that the BOE, through Cleveland, passively permitted over a period of fifteen (15) months constitute

retaliation against her.  As the BOE summarizes, these events include "(1) shortly after Self's resignation telling two maintenance men that Moore lied and got her husband fired; (2) inviting Plaintiff's ex-husband's girlfriend to the Tech Center in August 2004; and (3) making a 'death threat' to Plaintiff in April 2005. (Pl. Brief, p. 18-19)."  (Doc. #39 at 5).  As Moore relatedly argues, the failure of the BOE to discipline Mrs. Self for the incidents between them, including in particular the "death threat" that Mrs. Self allegedly made against Moore in April 2005, constitutes a retaliatory action against her.  (Doc. # 37 at 21).

As an initial matter, the court agrees with the BOE that many of the actions by Mrs. Self and Self relied upon by Moore are not properly attributable to it as retaliatory conduct.  These include: (1) Mrs. Self's discussions with the maintenance men (or any other employees) about Moore; (2) Mrs. Self's invitation to Moore's ex-husband's girlfriend to visit the Tech Center campus; and (3) Self's visit to the Tech Center campus in November 2004.  In particular, these involve actions by non-supervisors of Moore, and there is no evidence that the BOE adopted or ratified their conduct.  Further, Moore has not offered any case authority to support her position that these particular independent actions of Mrs. Self and Self are properly attributable to the BOE as examples of its retaliatory conduct against her.

30

**Failure to Discipline Mrs. Self**

Turning to the death threat, at first blush, the lack of any disciplinary action taken by the BOE against Mrs. Self regarding it might satisfy the reasonable material adversity standard.  However, this is not a situation in which the BOE failed to act at all.  Instead, it is undisputed that the BOE, through Cleveland, conducted an investigation of the alleged threats.  AF No. 41.  It is also undisputed that Mrs. Self denied Moore's report.  *Id.*  Therefore, in the context of teacher tenure law and the results of an investigation that amounted to a swearing match between Moore and Mrs. Self, the decision by the BOE not to discipline Mrs. Self was not an action "harmful to the point that it could well dissuade a 'reasonable worker from making or supporting a charge of discrimination.'"  *See Burlington Northern*, 548 U.S. at 69 ("'The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed.'") (citation omitted); *id.* ("A schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school age children.").

As for the other, less serious, incidents between Moore and Mrs. Self, the failure of the BOE to discipline Mrs. Self in writing for them similarly does not meet

the material adversity standard.  As the *Burlington Northern* Court explained:  "We speak of *material* adversity because we believe it is important to separate significant from trivial harms. Title VII, we have said, does not set forth 'a general civility code for the American workplace.'"  548 U.S. at 68 (citations omitted).  These other actions by Mrs. Self amount to "petty slights or minor annoyances that often take place at work and that all employees experience." *Id.*

Therefore, as these other exchanges between Mrs. Self and Moore do not meet the material adversity standard, then equally the lack of a write-up against Mrs. Self for them by the BOE does not either.  Moreover, it is undisputed that Mrs. Self was orally counseled by Cleveland for her unprofessional behavior.  AF No. 31.

## Actions by Cleveland

Moore has also failed to establish material adversity with respect to the post-November 2004 actions taken by Cleveland.  These include:  (1) the receipt of a job description and work schedule in February 2005; (2) the requirements that she paint in the cold once, that she use floor stripper, and that she use muriatic acid to clean a floor one day in February 2005; and (3) the unfair write-ups about her in February and April 2005.  (Doc. #37 at 20; Doc. #36 at Ex. 5, at Ex. 7 at 4, Ex. 10 at 2). Assuming that these are not too remote in time from any protected activity, *see* discussion on causal connection *infra*, they still fail to support a *prima facie* case of

32

retaliation.

Concerning the job description and schedule, it is undisputed that Moore accepted both without any objection. AF No. 47; AF No. 66. As for the specific job assignments that Moore disliked, even assuming that they fell outside the contours of her job description, these were isolated instances and limited in nature and as such at most constitute "minor annoyances" rather than reasonable material adverse circumstances. Finally, regarding the write-ups, even if they were improper, the court agrees with the BOE that they "essentially instructed [Moore] that she needed to comply with Cleveland's supervision, even if she did not like him." (Doc. #35 at 26). Further, there is no evidence that they materially affected her job in any way and by themselves do not rise to the level of deterring a reasonable employee from filing a charge.

## Other Evidence of Claimed Retaliatory Acts

Moore's other complaints in her brief about disparate disciplinary treatment and her objection to being placed on administrative leave with pay do not meet the reasonable material adversity standard either. (Doc. #37 at 21-22). Relying upon any differences in how the BOE treated Moore versus Mrs. Self amounts to a recasting of the similar arguments that Moore has made about the BOE's failure to discipline Mrs. Self generally and is unavailing. Further, as to administrative leave with pay,

Moore has not offered any evidentiary support to show that she objected to this decision or that it was done involuntary.  An employment action to which a plaintiff consents cannot then simultaneously serve as something which would objectively dissuade a reasonable worker from filing a charge.

       **b.**     **Alternatively, Moore cannot establish a causal connection.**

Alternatively, even if Moore has satisfied the *Burlington Northern*'s material adversity standard, her retaliation claims still fail because she is unable to establish a causal connection due to a lack of temporal proximity.  As the Eleventh Circuit has explained the causal connection element:

> In order to prevail on a retaliation claim, a plaintiff must establish the requisite causal connection between her statutorily protected conduct and the adverse employment action. *See Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir. 1993). To establish that causal connection, a plaintiff need only show "that the protected activity and the adverse action were not wholly unrelated." *Simmons v. Camden County Bd. of Educ.*, 757 F.2d 1187, 1189 (11th Cir. 1985). "At a minimum, a plaintiff must generally establish that the employer was actually aware of the protected expression at the time it took adverse employment action. The defendant's awareness of the protected statement, however, may be established by circumstantial evidence." *Goldsmith*, 996 F.2d at 1163 (internal citations omitted).

*Clover v. Total System Services, Inc.*, 176 F.3d 1346, 1354 (11th Cir. 1999).

In her opposition, Moore maintains that she engaged in three (3) separate instances of protected activity under Title VII:  (1) her reporting sexual harassment

to the BOE on January 26, 2004; (2) her filing a charge of discrimination with the EEOC on March 22, 2004; and (3) her complaining about Self's death threat on April 26, 2005.  (Doc. #37 at 17).  While items (1) and (2) fall within Title VII's anti-retaliation provisions, item (3) does not because it is not protected activity under either the opposition clause or the participation clause.

As the Eleventh Circuit described protected activity in *E.E.O.C. v. Total System Services, Inc.*, 221 F.3d 1171 (11th Cir. 2000):

> Title VII's retaliation provisions do protect certain kinds of activity. Under the opposition clause, an employer may not retaliate against an employee because the employee "has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e-3 (a).  And, under the participation clause, an employer may not retaliate against an employee because the employee "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." *Id.* . . .

> The participation clause covers participation in "an investigation . . . under this subchapter," that is, an investigation under subchapter VI of Chapter 21 of Title 42 (42 U.S.C. §§ 2000e- 2000e-17).  42 U.S.C. § 2000e-3(a). This clause protects proceedings and activities which occur in conjunction with or after the filing of a formal charge with the EEOC; it does not include participating in an employer's internal, in-house investigation, conducted apart from a formal charge with the EEOC. *See Silver v. KCA, Inc.*, 586 F.2d 138, 141 (9th Cir. 1978) (stating that participation means "participation in the machinery set up by Title VII to enforce its provisions"). We conclude that, because no EEOC complaint had been filed before Warren's termination, her taking part in Defendant's internal investigation did not constitute protected expression under the participation clause of Title VII.

*Total System*, 221 F.3d at 1174 (footnotes omitted).  Moore's report of the threat made by Mrs. Self does not meet either of the above protected activity standards. Therefore, in terms of measuring temporal proximity, the most recent protected activity upon which Moore properly relies dates back to March 22, 2004, the day on which she filed her EEOC charge.

The primary adverse employment action about which Moore complains is her involuntary transfer occurring on May 11, 2005, which is over fifteen (15) months after lodging an internal claim of sexual harassment against Self and over eleven (11) months after filing an EEOC charge.  "[I]n the absence of other evidence tending to show causation, if there is a substantial delay between the protected expression and the adverse action, the complaint of retaliation fails as a matter of law."  *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) (citations omitted).

As the Eleventh Circuit has explained the causal connection *prima facie* element:

> We have noted that the Supreme Court in a Title VII retaliation case has stated that in order to show a causal connection "mere temporal proximity between knowledge of protected activity and an adverse action must be 'very close.'"  *Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004) (involving alleged retaliation under the ADA) (citing *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273, 121 S. Ct. 1508, 1511, 149 L. Ed. 2d 509 (2001) (alterations omitted)).  Moreover, we have observed that the Supreme Court has cited with approval decisions in which a three to four month disparity was found to be insufficient to

show causal connection. *Id.* We concluded that "[i]f there is a substantial delay between the protected expression and the adverse action in the absence of other evidence tending to show causation, the complaint of retaliation fails as a matter of law." *Id.*

*Wallace*, 212 Fed. Appx. at 802. Time elapses of over fifteen (15) months and eleven (11) months are not only not "very close," but also are substantially far from "very close." *See Thomas*, 506 F.3d at 1364 ("That three (3) month period, without more, does not rise to the level of 'very close.'") (citing *Clark*, 532 U.S. at 273).

Moreover, both of these time periods are in excess of other examples in which the Eleventh Circuit has determined that a causal connection, in the absence of any other supporting evidence, did not exist as a matter of law. *See, e.g.*, *Watkins v. Huntsville, Ala.*, 176 Fed. Appx. 955, 956-57 (11th Cir. 2006) (affirming summary judgment on plaintiff's retaliation claim because eight (8) month lapse between filing of EEOC charge and her termination does not support causal link and plaintiff could not show nexus otherwise); *Hammons v. George C. Wallace State Comm. Coll.*, 174 Fed. Appx. 459, 464 (11th Cir. 2006) (affirming summary judgment on plaintiff's retaliation claim because letter of grievance written to chancellor five (5) months before termination is not sufficient temporal proximity to establish causal element of *prima facie* case); *Wascura v. City of S. Miami*, 257 F.3d 1238, 1245 (11th Cir. 2001) (three and one-half (3 1/2) month temporal proximity, without more, is insufficient

to create jury issue); *Sierminski v. Transouth Fin. Corp.*, 216 F.3d 945, 951 (11th Cir. 2000) (holding that seven (7) month time period between protected activity and adverse employment action is too indirect to satisfy causal connection requirement); *Sullivan v. Nat'l R.R. Passenger Corp.*, 170 F.3d 1056, 1160-61 (11th Cir. 1999) (finding no causal link between protected activity in February 1994 and adverse employment actions in late 1994 and early 1995).

Also remote in time is Moore's objection to Cleveland's treatment of her after she talked to him about Self's November 2004 visit to the Tech Center.  Based upon this time period, the earliest of Cleveland's alleged retaliatory acts, including being "very snappy," did not begin until ten (10) months after Moore's internal harassment complaint against Self and eight (8) months after her charge had been filed.  The later retaliatory acts that Moore attributes to Cleveland are even more remote in time, including: (1) the receipt of a job description and work schedule in February 2005; (2) the requirements that she paint in the cold once, that she use floor stripper, and that she use muriatic acid to clean a floor one day in February 2005; and (3) the unfair write-ups about her in February and April 2005.  Because all of these actions occurred more than a year after her January 2004 harassment complaint about Self and none occurred closer than eleven (11) months after her March 2004 EEOC charge, they cannot, by temporal proximity alone, support a retaliation claim as a

matter of law.

Further, Moore has not adduced sufficient "other evidence tending to show causation."  While, in her opposition brief, Moore conclusively states that she "has offered other substantial evidence tending to show causation[,]" she fails to identify what body of other evidence upon which she relies.  (Doc. #37 at 25).  She then refers back to the BOE's undisputed knowledge of the EEOC charge.  (*Id.*).  Proof of an employer's knowledge of a charge does not cure the time gap deficiency between the protected activity and alleged retaliatory action.  *See Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1337 (11th Cir. 1999) ("We have plainly held that a plaintiff satisfies this element if he provides sufficient evidence that the decision-maker became aware of the protected conduct, <u>and</u> that there was close temporal proximity between this awareness and the adverse employment action.") (citations omitted) (emphasis added).

Then Moore states that "there is substantial credible evidence that [the BOE's] decision to transfer Moore was motivated chiefly by the conflict resulting from the filing, investigation, and disposition of Moore's sexual harassment complaint." (Doc. #37 at 25-26).  This is Moore's characterization of Cleveland's testimony.

Cleveland's complete testimony that Moore relies upon states:

Q.     And tell me how she [*i.e.*, Moore] would have been best served by

receiving a transfer to another school?

A.     She had requested verbally numerous times that she and Mrs. Self not have to work together, to be separated.  She had verbally requested, however she found out, about the request that Mrs. Self has made to be transferred.  So it was in her best interest.  She was -- we were fulfilling something she had asked us to do, too, with this program need transfer.

Q.     Other than what you've described to me in your answer a moment ago, anything else related to program need -- is there anything else related to program needs that you felt like would be accomplished by transferring [Moore]?

A.     I just felt like it would -- as I said earlier, I felt like it would be in the best interest of her.  It would help her with the complaints that she had made to me about her job assignments.  It would, you know, help the whole situation.  And, you know, I thought it was a good approach to take.  The location of the school was approximately the same distance, the same money, the same contract.  There was really no harm to the employee.  It was a -- you know, just a vertical [sic] move, and it would, you know, have helped that employee to overcome that situation.

(Doc. #36 at Ex. 3 at 150, 155-56 (emphasis added)).  Accordingly, Cleveland never directly or indirectly testified that the decision to transfer Moore was due to her filing the EEOC charge against Self.  Instead, Cleveland's testimony supports the BOE's explanation that it decided to transfer Moore "because the [undisputed] conflict between Mrs. Self and Plaintiff was interfering with the running of the Tech Center[.]"  (Doc. #39 at 4).

That the conflict between Mrs. Self and Moore resulted from the disposition

of Moore's EEOC charge against Self (and his related resignation) does not provide

sufficient *prima facie* evidence that the decision to transfer Moore in May 2005 (well

after Self had resigned), is causally connected to Moore's filing of an EEOC charge

eleven (11) months earlier.  If anything, this <u>admitted</u> discord between Mrs. Self and

Moore and their desire to work separately from each other in light of their (not

surprisingly) strained relations breaks any potential causal chain.  *See Hankins v.*

*AirTran Airways, Inc.*, 237 Fed. Appx. 513, 521 (11th Cir. 2007) ("Despite a close

proximity in time between these events, the evidence establishes that Hankins'

flagrant act of misconduct broke the causal chain.").  Therefore, because temporal

proximity is pivotal to satisfying the causation element in this instance and because

the other evidence upon which Moore relies does not adequately link her involuntary

transfer to the filing of her EEOC charge, Moore cannot establish a *prima facie* case

of retaliation for this additional reason.

> **2.      Alternatively, Moore cannot establish pretext.**

To the extent that Moore has established a *prima facie* case of retaliation,

summary judgment is still alternatively proper because she cannot show pretext. In

addressing the issue of pretext, the Supreme Court has stated:

> Thus, a plaintiff's *prima facie* case, combined with sufficient evidence
> to find that the employer's asserted justification is false, may permit the
> trier of fact to conclude that the employer unlawfully discriminated.

41

This is not to say that such a showing by the plaintiff will *always* be adequate to sustain a jury's finding of liability.  Certainly there will be instances where, although the plaintiff has established a *prima facie* case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory.  For instance, an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, non-discriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred. . . .

Whether judgment as a matter of law is appropriate in any particular case will depend on a number of factors.  Those include the strength of the plaintiff's *prima facie* case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law.

*Reeves*, 530 U.S. at 148-49 (emphasis by underlining added) (citations omitted).

Therefore, despite a plaintiff's efforts to demonstrate an issue of fact regarding the truthfulness of an employer's asserted justification for an adverse action, judgment as a matter of law in favor of the employer is still appropriate if the record: (1) conclusively demonstrates some other, non-discriminatory or non-retaliatory basis for the decision; or (2) reveals only a weak issue of fact coupled with plentiful evidence that no illegal discrimination and/or retaliation took place.

Here, the only alleged retaliatory act that Moore addresses in her brief with

respect to pretext is the BOE's transfer decision. (Doc. #37 at 26-27). Moore has not effectively refuted the BOE's articulated reason for transferring Moore, *i.e.*, the disruptive conflict and or "situation" between Moore and Mrs. Self culminating in their desire to work apart from each other and the corresponding unavailability of a suitable place to transfer Mrs. Self.

To the extent that Moore questions Cleveland's testimony and/or his credibility in describing the transfer decision, she has failed to identify any inconsistency that sufficiently undermines the BOE's explanation for its actions. *See Brown v. American Honda Motor Co., Inc.*, 939 F.2d 946, 954 (11th Cir. 1991) ("Although the plaintiff has produced scattered pieces of circumstantial evidence, none of it, even taken as a whole, raises sufficient questions to undermine Honda's nondiscriminatory rationale."). Instead, at most Moore has only shown a weak issue of fact in a record with plentiful evidence that no illegal retaliation took place regarding her transfer.

As for any other purported acts of retaliation, the BOE has articulated legitimate explanations for its actions, and Moore has abandoned any argument of pretext regarding them, having omitted any reference to them in that section of her brief. (Doc. #37 at 26-27); *see, e.g., Wilkerson v. Grinnell Corp.*, 270 F.3d 1314, 1322 (11th Cir. 2001) (finding claim abandoned when argument not presented in initial response to motion for summary judgment); *Coalition for the Abolition of*

*Marijuana Prohibition v. City of Atlanta*, 219 F.3d 1301, 1326 (11th Cir. 2000) (failure to brief and argue issue at the district court is sufficient to find the issue has been abandoned).   Therefore, Moore has failed to carry her burden on summary judgment in showing pretext as to her purported retaliatory transfer and any other claims of retaliatory conduct.   Accordingly, the BOE's Motion for Summary Judgment is due to be granted for this additional ground.

## V.   CONCLUSION

Therefore, the BOE has met its burden on summary judgment of demonstrating the absence of any material factual dispute and entitlement to judgment as a matter of law on Moore's retaliation count.   Further, with no claims remaining, Moore's case is due to be dismissed with prejudice.   The court will enter an order consistent with this memorandum opinion.

**DONE** and **ORDERED** this the 4th day of September, 2008.

**VIRGINIA EMERSON HOPKINS**
United States District Judge

44